IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ALICE T., | **8:21CV14** |
| Plaintiff, | |
| vs. | **MEMORANDUM AND ORDER** |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security; | |
| Defendant. | |

This is an action under 42 U.S.C. § 405(g) for judicial review of the Social Security Commissioner's final decision denying Plaintiff's application for disability insurance benefits.[1] For the reasons discussed below, the Commissioner's decision will be reversed and the matter will be remanded for further proceedings.

## I. BACKGROUND

### A. Procedural History

Plaintiff protectively filed an application for disability insurance benefits on January 13, 2017. She alleged disability beginning March 11, 2011, but later amended the alleged onset date at hearing to December 1, 2017, which was roughly when she would change age categories per the Medical-Vocational Guidelines. (See Tr. 10, Filing 16-2 at 11).

The Social Security Administration denied Plaintiff's claim initially and upon reconsideration. Plaintiff requested a hearing before an administrative law judge ("ALJ"), which was held on June 3, 2019. Plaintiff testified at the hearing and was represented by counsel. A vocational expert also testified. (Tr. 10, Filing 16-2 at 11).

---

[1] In accordance with General Order No. 2015-15 (Filing 4), the matter is submitted to the court on cross-motions (Filings 20, 22), based on review of the parties' briefs (Filings 21, 23, 28) and the administrative record (Filings 14-16).

The ALJ denied Plaintiff's claim on July 17, 2019. (Tr. 7, Filing 16-2 at 8). On November 17, 2020, the Appeals Council denied review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 1, Filing 16-2 at 2). This action was timely filed on January 11, 2021. (Filing 1).

**B. The ALJ's Decision**

In evaluating Plaintiff's claim, the ALJ followed the 5-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a).[2] Plaintiff's date last insured was December 31, 2017. The ALJ found Plaintiff had not engaged in substantial gainful activity since her amended alleged onset date of December 1, 2017, through her date last insured. (Tr. 12, Filing 16-2 at 13).

The ALJ found Plaintiff had the following severe impairments: post-herpetic neuralgia; degenerative disc disease of the cervical spine; fibromyalgia; degenerative joint disease of the left knee; adjustment disorder; and anxiety disorder.[3] He also found Plaintiff did not have an impairment or combination of impairments that met or equaled the Listings. (Tr. 12-16, Filing 16-2 at 13-17).

The ALJ then determined Plaintiff's residual functional capacity ("RFC"), finding she had the following limitations through her date last insured:

[T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant could stoop, kneel, crouch, and crawl occasionally. She could perform work that did not require exposure to extreme and sustained cold or heat or to sustained and concentrated vibration. She was able to perform work

[2] The five steps are: "(1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ('Appendix'); (4) whether the claimant can return to her past relevant work; and (5) whether the claimant can adjust to other work in the national economy." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." *Id.* (citations omitted).

[3] The ALJ found Plaintiff's urinary incontinence and obesity were non-severe impairments. (Tr. 13, Filing 16-2 at 14).

that was simple and uncomplicated and response appropriately to at least routine changes in the workplace.

(Tr. 16, Filing 16-2 at 17).

The ALJ found Plaintiff was not able to perform her past relevant work as an aerospace physiologist. On the date last insured, Plaintiff was 49 years old, which is defined as a younger individual (age 18-49). She has at least a high school education and is able to communicate in English. The ALJ did not make a transferability-of-job-skills determination, finding it was not material to a disability determination in Plaintiff's case. (Tr. 20, Filing 16-2 at 21).[4]

Considering Plaintiff's age, education, work experience, and RFC, the ALJ found she could perform other light unskilled work which existed in the national economy. Specifically, the ALJ found Plaintiff was able to perform the occupations of mail clerk, photocopy machine operator, and office helper. Consequently, the ALJ found Plaintiff was not disabled. (Tr. 20, Filing 16-2 at 21).

---

[4] Grid Rule 201.14 of Appendix 2 to Subpart P of Part 404, the Medical-Vocational Guidelines directs a finding of "Disabled" when: (1) the maximum sustained work capability is limited to sedentary work, (2) the claimant is closely approaching advanced age, (3) the claimant is a high school graduate or more and her education does not provide for direct entry into skilled work, and (4) the claimant's work experience involved skilled or semi-skilled work and those skills are not transferable. *Papesh v. Colvin*, 786 F.3d 1126, 1135 (8th Cir. 2015). Here, the ALJ found Plaintiff was capable of performing light work. "The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing—the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position." SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983).

## II. EVIDENTIARY MATERIALS

### A. Administrative Hearing Testimony

Plaintiff testified she was not working, and had not worked since she was medically retired from the Air Force. She developed shingles and because of the resulting nerve damage and a neurostimulator implant, she was grounded. She was unable to work as an instructor because she could not stand in a classroom for 4-5 hours a day, and wound up just answering phones. (Tr. 46-49, Filing 16-2 at 47-50).

Plaintiff testified it was difficult to move around or sit when using the neurostimulator on medium and high settings. She used the neurostimulator for up to five hours a day on bad days—the same was true two years prior. (Tr. 54-55, Filing 16-2 at 55-56). Plaintiff described her pain:

> I have pain all over. One due from the fibromyalgia. It feels like, it feels like shooting—it feels like a pin being stuck into different part of the body. But from the postherpetic neuralgia, the worse of it is on the left side. That's where I had the shingles twice, on this side. So, it's on my neck, my chest, my shoulder, my arms, all the way down to my hands. It's like shooting pain. It's a dull pain all the time. But then I would get that shooting pain that comes all the way down from my neck all the way down to my hands.

(Tr. 55-56, Filing 16-2 at 56-57). Plaintiff also described left shoulder and neck pain, and her neck surgery in July of 2018. (Tr. 56-57, Filing 16-2 at 57-58).

Plaintiff testified she could sit for 20 to 30 minutes and could stand for maybe 15 minutes at a time if her knees were not bothering her. Plaintiff explained she had left knee surgery in 2017; she had ataxia that interfered with walking; she fell a lot; Lyrica affected her balance. Plaintiff testified she had difficulty lifting more than 5 to 10 pounds using both of her hands. She occasionally used a cane for balance issues. (Tr. 57-60, 77, Filing 16-2 at 58-61, 78).

Plaintiff explained she had depression, anxiety, and PTSD, which made it difficult for her to concentrate. Her pain exacerbated her mental impairments and wore her down and dictated her life. (Tr. 63, Filing 16-2 at 64). She stated:

When all this pain started happening, it just seemed like everything is based around this pain. Like, I can't do something because of this pain. I can't be a part of something because of this pain. It's just—it just seems like it's—and it never ends. Even when I think things are getting better, then it comes back. Like, after the neurostimulator, it comes back. After this surgery that I had on my neck, it comes back. It just seems like this postherpetic neuralgia, it's just, it's like it's had a hold of this left side and it just won't let go. And then the fibromyalgia, which is like the needles, feels like the needles being stuck all over my body. And that included the right side.

(Tr. 74, Filing 16-2 at 75).

Plaintiff testified she tried to help occasionally with her son's marching band and tried to be in the church choir. She had also been a Sunday school teacher, which she gave up as she kept having to call in and say she could not make it. Plaintiff finished a second master's degree in child counseling in 2017 through an online courses program. She explained she could do the work at her own pace and could lay down and read or could sit down and read depending on her pain. She finished her courses and degrees in elementary education because that had been her dream, even though she did not have the stamina to teach elementary kids or stand for hours at a time. (Tr. 63-68, 76, Filing 16-2 at 64-69, 77).

The ALJ's first hypothetical question to the vocational expert ("VE") limited the hypothetical individual to light exertional work with postural and environmental limitations. The VE explained past relevant work would be unavailable and testified Plaintiff would have no transferable skills from her past relevant work to the sedentary or light exertional levels. The ALJ then asked the VE—after a few questions from Plaintiff's attorney—whether the VE could identify other unskilled work. The vocational expert identified the jobs of mail clerk, photocopy machine operator, and office helper. The ALJ then added reasoning level limitations making up the eventual RFC determination and asked whether Plaintiff could perform the three jobs just listed. The VE answered: "Yes, your honor. Those are all unskilled, light positions." (Tr. 80-83, Filing 16-2 at 81-84). In point of fact, the mail clerk position required a higher level of reasoning.

## B. Relevant Medical and Other Evidence

Early records from 2010 detail Plaintiff's difficulties with postherpetic neuralgia following shingles outbreaks. (See Tr. 887, ECF 18-1 at 82). After steady treatment for most of the year, Plaintiff still had "significant debilitating pain and depression." (Tr. 1187, Filing 18-2 at 157). Ablation was not reasonably likely to help, so Plaintiff and her providers were pursuing a spinal cord stimulator. Plaintiff's right-sided pain had an unclear etiology, so a rheumatology consult was planned. (Tr. 1188, Filing 18-2 at 158). Prior to March 2, 2011, Plaintiff was diagnosed with fibromyalgia by the rheumatologist. (See Tr. 1147, Filing 18-2 at 117). On March 2, 2011, she was cleared for the spinal cord stimulator implant, which was performed on March 10, 2011. (Tr. 1147-50, Filing 18-2 at 117-120). By December of 2011, Plaintiff was pending retirement. (Tr. 1103, Filing 18-2 at 73). By April of 2012, Plaintiff was medically retired. (Tr. 1085-86, Filing 18-2 at 55-56).

In May of 2012, Plaintiff underwent compensation and pension examinations at the VA. (See Tr. 2834, Filing 21-2 at 144; Tr. 2742, Filing 21-2 at 52). John Engler, Ph.D., opined based on his examination of Plaintiff on May 18, 2012, and review of other records that Plaintiff's service-connected mental impairments did not render her unable to secure and maintain substantially gainful employment. (Tr. 2702-03, Filing 21-2 at 12-13). However, Christine J. Head, MS, PA-C, opined based on her review of available records that Plaintiff would be unable to secure and maintain substantial gainful employment secondary to her service connected disabilities. (Tr. 2707-11, Filing 21-2 at 17-21). She stated:

> I find the veteran would be unable to perform labor type work secondary to her pain associated with post herpetic neuralgia and polyradiculitis and fibromyalgia. In addition, the veteran requires narcotic medication to manage the pain making it difficult to perform sedentary work in regards to concentration and focus. In addition, the veteran must use the restroom every hour secondary to her urinary incontinence making the type of sedentary work very limited that would be able to accommodate this need.

(Tr. 2710-11, Filing 21-2 at 20-21).

6

On January 17, 2013, Plaintiff's follow-up compensation and pension reports and exams were performed. On February 26, 2013, the Department of Veterans Affairs determined Plaintiff was individually unemployable as of March 1, 2012. (See Tr. 217-25, Filing 16-5 at 17-25).

On May 15, 2013, Plaintiff saw providers in the VA pain management clinic. (Tr. 2643-55, Filing 21-1 at 199-211). She reported her pain was almost constant, and was associated with numbness and weakness in her entire left chest area, left shoulder, and down her left arm. She had gained weight due to inactivity which made her depressed. She rated her pain on average a 5 out of 10 with medications. (Tr. 2648, Filing 21-1 at 204).

On May 16, 2013, Plaintiff had consultative examinations relating to a prior application for disability insurance benefits. A report by Dr. Meryl Severson, M.D., states as part:

> Because of pain from her herpes zoster and fibromyalgia she is unable to do any daily activities without pain. Her ability to walk a distance is variable, she has pain on stairs, and can not stand more than 10 minutes. When her pain is severe she has to lie down.

(Tr. 3294, Filing 22-2 at 152). Dr. Barb Eckert, Psy.D., found Plaintiff was able to understand, remember, and carry out short and simple instructions under ordinary supervision. (Tr. 3283, Filing 22-2 at 141).

Plaintiff's fibromyalgia and herpetic neuralgia continued to cause her pain and limitations and she continued to treat with the VA and non-VA providers, as noted in December of 2015. (Tr. 986-87, Filing 18-1 at 181-82).

In early January of 2017, Plaintiff underwent a left knee arthroscopy. (See Tr. 1407, ECF 19-1 at 47). She also had left shoulder pain and difficulties. (Tr. 616, Filing 17-2 at 38). She received regular counseling and psychiatric medication management through the VA. (See id.; Tr. 2266, Filing 20-2 at 70). She was engaged in a VA group weight loss program, due to continued weight gain due to decreased activity, depression, and eating more. (Tr. 2263-64, Filing 20-2 at 67-68). She had a handicap parking permit. (Tr. 606, Filing 17-2 at 28).

In February of 2017, Plaintiff was noted to be "unable to complete 4 METS [metabolic equivalents] secondary to bilateral knee pain," and she reported shortness of breath with climbing of stairs during a workup prior to her eventual left shoulder surgery. (Tr. 895, Filing 18-1 at 90). Plaintiff's mother was staying with her and helping her with things at home at this time, as she was recovering from her left knee surgery. (Tr. 600, Filing 17-2 at 22). When her mother left, Plaintiff struggled with loneliness and was having difficulty sleeping—regularly sleeping 4 hours and some nights less than that. (Tr. 596, Filing 17-2 at 18).

In March of 2017, Plaintiff underwent physical therapy for her left knee. (Tr. 2226, Filing 20-2 at 30). She participated in a VA nutrition group. (Tr. 2221, Filing 20-2 at 25). She reported poor sleep to her therapist. (Tr. 586, Filing 17-2 at 8). In April of 2017, Plaintiff reported she was sleeping better and felt fulfilled with her church work. (Tr. 580, Filing 17-2 at 2). She received an award from the PTA concerning her volunteer work. Plaintiff felt more comfortable with herself and leaving the home alone and was more active with the church. (Tr. 577, Filing 17-1 at 216). In May of 2017, Plaintiff reported she continued to help at church and her son's school. (Tr. 2172, Filing 20-1 at 221).

However, in June of 2017, Plaintiff reported sharp pain in her left hand to her primary care physician through the VA. (Tr. 560, Filing 17-1 at 199). The provider diagnosed carpal tunnel syndrome. (Tr. 562, Filing 17-1 at 201). The next day, the provider ordered further workup for her left arm and left-hand pain. (Tr. 558, Filing 17-1 at 197). This included imaging of Plaintiff's cervical spine, which showed "[d]egenerative changes particularly involving the C3-5-6 disc space, but also at C4-5 and C6-7." (Tr. 3175, Filing 22-2 at 33).

In July of 2017, Plaintiff fell and injured her right knee and sought emergency department treatment after the pain did not resolve. She was provided a Corflex hinged wrap around for her right knee. (Tr. 544-49, Filing 17-1 at 183-88).

In August of 2017, Plaintiff's EMG/NCS [electromyogram and nerve conduction studies] results showed electrophysiologic evidence suggestive of a slightly active left C6 radiculopathy and no evidence of left median or ulnar entrapment neuropathy—her left arm and hand pain numbness was potentially due to cervical radiculopathy and not carpal tunnel syndrome. (See Tr. 543-44, Filing

17-1 at 182-83; Tr. 2116, Filing 20-1 at 165). On August 8, 2017, Plaintiff sought emergency department treatment for evaluation of her chronic neck pain. (Tr. 542, Filing 17-1 at 181). On August 22, 2017, Plaintiff began physical therapy for her neck pain and cervical radiculopathy. (Tr. 421-25, Filing 17-1 at 60-64). She continued physical therapy on August 24 and August 29, 2017. (Tr. 2095, Filing 20-1 at 144; Tr. 2093, Filing 20-1 at 142). On August 31, 2017, Plaintiff was discharged from physical therapy for her neck pain with radiculopathy. (Tr. 531, Filing 17-1 at 170).

On August 30, 2017, Plaintiff completed her initial disability report, claiming her ability to work was limited by fibromyalgia; paralysis of musculospiral nerve; major depression; anxiety; chronic pain syndrome; PTSD; low back pain; chronic myofascial pain syndrome; chronic fatigue/insomnia; and chronic cystitis. Plaintiff reported she was 5'3" and weighed 220 pounds. (Tr. 269, Filing 16-7 at 13).

On September 18, 2017, Plaintiff completed a daily activities and symptoms report for social security. She explained she had some light activities, but when her pain level was too high many of her daily activities were not accomplished. She explained she did not do outside chores due to weakness in her left neck, arm, shoulder, and hand. She explained that when her neurostimulator was on high, she could hardly move at all and remained in bed. She explained she could not walk or stand for very long due to pain in both her knees and widespread pain. She explained sometimes it helped to lay down, but when she laid down and turned up the neurostimulator, she was incapacitated. On bad days, her pain could reach 6 out of 10 and was incapacitating. Exercising was difficult and she had nearly stopped because she did not want to make things worse. (Tr. 2912-94, Filing 16-7 at 35-38).

On October 19, 2017, CT imaging of Plaintiff's cervical spine was performed. (Tr. 1284-86, Filing 18-3 at 19-21). The imaging showed degenerative changes with moderate to severe bony left foraminal narrowing at C5-6 and C6-7, and reversal of cervical alignment, centered at C5, that was possibly positional or due to muscle spasm. (Tr. 1286, Filing 18-3 at 21). On October 23, 2017, Plaintiff sought treatment for rib pain after a fall and landing on her right side. (Tr. 1612, Filing 19-2 at 57).

On November 9, 2017, the state agency medical consultant, Jerry Reed, M.D., concluded based on his review of records that Plaintiff could occasionally lift 20 and

frequently lift 10 pounds, and could push or pull within those limitations; could sit, stand or walk for 6 hours in an 8-hour work day; had occasional postural limitations; had no manipulative, visual, or communicative limitations; and no environmental limitations except to avoid concentrated exposure to vibration and even moderate exposure to hazards. (Tr. 89-101; Filing 16-3 at 2-15). The state agency consulting psychologist, Rebecca Braymen, PhD., concluded Plaintiff would be moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 102-04; Filing 16-3 at 15-17).

December 1, 2017 was Plaintiff's amended alleged onset date of disability. (Tr. 10, Filing 16-2 at 11). On December 6, 2017, Plaintiff reported to social security that she had pain in the left side of her neck since summer of 2017. (Tr. 302, Filing 16-7 at 46). December 31, 2017 was Plaintiff's date last insured. (Tr. 12, Filing 20-1 at 124).

On January 25, 2017, on reconsideration of Plaintiff's claim, a second state agency medical consultant, Alexandra Suslow-Geditz, M.D., generally agreed with Dr Reed's physical RFC assessment, but opined that Plaintiff should also avoid concentrated exposure to extreme cold or heat. (Tr. 108-120; Filing 16-3 at 21-33). Patricia Newman, PhD., opined that Plaintiff had moderate limitations in her ability to concentrate, persist, or maintain pace, and mild limitations in her ability to adapt or manage herself. (Tr. 120-22; Filing 16-3 at 33-35).

Following Plaintiff's date last insured, on January 20, 2018, Plaintiff saw Laura Cornelius for psychiatric medication management. (Tr. 2069-73, Filing 20-1 at 118-22). Plaintiff was wearing two knee braces and using a cane. (Tr. 2069, Filing 20-1 at 118).

On January 31, 2018, Plaintiff reported to her primary care she continued to have knee pain and falls and was referred to physical therapy to help improve balance and pain control. Plaintiff had received epidural steroid injections with an outside provider with no relief and had been told there was possible surgery in the future for her neck pain. (Tr. 2062, Filing 20-1 at 111).

10

On February 9, 2018, Plaintiff started physical therapy for her knee pain and balance issues. She reported two falls a month and dizziness at times. (Tr. 2051, Filing 20-1 at 100). She reported she felt dizziness when the neurostimulator was on and felt that made balancing harder. Her goal was to find a reason for why she had falls. (Tr. 2052, Filing 20-1 at 101).

On February 21, 2018, Plaintiff saw a provider for a urinary tract conditions compensation and pension examination. (See Tr. 3329, Filing 22-2 at 187). The provider opined Plaintiff had to be near a bathroom and could perform no heavy lifting, pushing or pulling activities due to this condition. (See Tr. 3333, Filing 22-2 at 191).

In March of 2018, Plaintiff reported to her therapist she had decreased many activities due to pain. (Tr. 2024, Filing 20-1 at 73). Plaintiff also had continued neck pain, which had been a problem since the prior summer. (Tr. 2008, Filing 20-1 at 57).

On April 11, 2018, Plaintiff had a repeat neck CT scan. (Tr. 3163-65, Filing 22-2 at 21-23). On April 20, 2018, Plaintiff reported she was in pain all day. (Tr. 1991, Filing 20-1 at 40). By July of 2018, a fusion surgery was performed on Plaintiff's cervical spine. (Tr. 3250, Filing 22-2 at 108)

### III. STANDARD OF REVIEW

The court may reverse the Commissioner's findings only if they are not supported by substantial evidence or result from an error of law. *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."). Under this standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is "more than a mere scintilla." *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

In determining whether evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. If substantial evidence supports the Commissioner's conclusion, the court may not reverse merely because substantial evidence also supports the contrary outcome and even if the court would have reached a different conclusion. *Nash*, 907 F.3d at 1089. The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions of the Social Security Administration." *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015).

The Court must also determine whether the Commissioner's decision is based on legal error. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id*. (citing *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003); *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983)). No deference is owed to the Commissioner's legal conclusions. *Brueggemann*, 348 F.3d at 692 (stating allegations of legal error are reviewed de novo).

## IV. ISSUES PRESENTED

As set out in the Table of Contents and Argument headings of Plaintiff's brief in support of motion to reverse the Commissioner's decision (Filing 31 at 1, 16-28), Plaintiff contends:

1. The ALJ's Step Five denial of benefits is not supported by substantial evidence due to the ALJ's SSR 00-4p error.

2. The ALJ erred by not articulating how persuasive the ALJ found the opinions of the C&P physician [sic], Ms. Head, concerning Plaintiff's inability to perform substantial gainful activity due to her service-connected physical impairments.

3. The ALJ erred by not evaluating Dr. Severson's opinions in the hearing decision.

4. The ALJ did not provide good reasons for finding Plaintiff was not credibly reporting her limitations.

5. The ALJ erred by not fully and fairly developing the record concerning "some medical evidence" support for the RFC.

6. The Commissioner's removal protection violated the Separation of Powers, resulting in an unconstitutional denial of benefits.

## V. DISCUSSION

### A. Ms. Head's Opinions

Plaintiff complains that "[t]he ALJ did not discuss any of the compensation and pension ('C&P') reports" from the U.S. Department of Veteran's Affairs and, in particular, "did not evaluate the C&P opinions concerning how Plaintiff's service-connected conditions limited her, including the opinions of [Christina J. Head, MS, PA-C] from January of 2013 that supported the VA's Individual Unemployability determination." (Filing 31 at 19-20). Plaintiff contends this is contrary to Social Security Ruling 06-03p,[5] which states:

The regulations at 20 CFR 404.1504 and 416.904 provide that:

[a] decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency [e.g., Workers' Compensation, the Department of Veterans Affairs, or an insurance company] that you are disabled or blind is not binding on us.

_____

[5] Effective for claims filed on or after March 27, 2017, the SSA has rescinded Social Security Ruling 06-03p as being inconsistent with revisions to the SSA's rules regarding the evaluation of medical evidence, as published on January 18, 2017. *See* SSR 96-2p, 2017 WL 3928305, at *1 (SSA Mar. 27, 2017). "[I]n claims filed on or after March 27, 2017, the final rules state that adjudicators will not provide any articulation about their consideration of decisions from other governmental agencies and nongovernmental entities because this evidence is inherently neither valuable nor persuasive to [the Social Security Administration]." *Id.* at *2; *see also* 20 C.F.R. § 404.1504. Social Security Ruling 06-03p still applies to Plaintiff's claim.

13

Under sections 221 and 1633 of the Act, only a State agency or the Commissioner can make a determination based on Social Security law that you are blind or disabled. Our regulations at [former] 20 CFR 404.1527(e) and 416.927(e) make clear that the final responsibility for deciding certain issues, such as whether you are disabled, is reserved to the Commissioner (see also SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner"). However, we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies (20 CFR 404.1512(b)(5) and 416.912(b)(5)). Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.

These decisions, and the evidence used to make these decisions, may provide insight into the individual's mental and physical impairment(s) and show the degree of disability determined by these agencies based on their rules. We will evaluate the opinion evidence from medical sources, as well as "non-medical sources" who have had contact with the individual in their professional capacity, used by other agencies, that are in our case record, in accordance with 20 CFR 404.1527, 416.927, Social Security Rulings 96-2p and 96-5p, and the applicable factors listed above in the section "Factors for Weighing Opinion Evidence."

Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, we are not bound by disability decisions by other governmental and nongovernmental agencies. In addition, because other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency. However, the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases.

SSR 06-03p, 2006 WL 2329939, at *6-7  (S.S.A. Aug. 9, 2006).

Several years before the issuance of this ruling by the agency, the Eighth Circuit held that "findings of disability by other federal agencies, even though they

14

are not binding on an ALJ, are entitled to some weight and must be considered in the ALJ's decision." *Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998) (holding ALJ's failure to address VA's determination that the plaintiff was permanently and totally disabled was reversible error). The Court stated:

> If the ALJ was going to reject the VA's finding, reasons should have been given, to enable a reasoned review by the courts. We are fortified in this conclusion by the fact that the Social Security Administration has given this very instruction to its adjudicators. A 1992 memorandum from the Social Security Administration's Chief Administrative Law Judge to the Office of Hearings and Appeals field personnel reminded "all ALJs and decision writers that even though another agency's determination that a claimant is disabled is not binding on SSA ..., the ALJ must evaluate it as any other piece of evidence, *and address it in the decision.*" Memorandum, Social Security Administration Office of Hearings and Appeals (Oct. 2, 1992), at 3 (emphasis added).

*Id. Cf. Pelkey v. Barnhart*, 433 F.3d 575, 579-80 (8th Cir. 2006) (holding that although the ALJ did not mention the VA's 60 percent disability rating, there was no error because the ALJ "considered and discussed the underlying medical evidence contained in the VA's Rating Decision.").

In the present case, the ALJ's discussion of the VA's disability decision and underlying medical evidence consists of two paragraphs:

> The undersigned gives no weight to the opinion of Laura Baker, PA-C (Exhibit 14F).[6] Ms. Baker performed a VA assessment regarding the claimant's urinary incontinence. She wrote that the condition required that the claimant be near a restroom and precluded her from heavy lifting and pushing or pulling activities. Aside from these conclusory statements being too vague to be helpful to the determination of disability, it is apparent that Ms. Baker's statements were largely, if not entirely, informed by the claimant's subjective reports. She noted that she did not review the claimant's records. While she noted that she

---

[6] Exhibit 14F, which is dated February 21, 2018, was put into evidence subsequent to the hearing. (See Tr. 3329-35, Filing 22-2 at 187-93). Plaintiff does not contend that the ALJ's dismissal of Ms. Baker's opinions was erroneous.

15

examined the claimant, there are no physical exam or other objective findings listed or referenced in support of her statements.

The record also contains conclusions of the VA regarding the claimant's employability, which the undersigned gives little weight (See, for example, Exhibit 10D).[7] These are dated well before the claimant's alleged onset date and give little indication as to their basis. In any event, 20 CFR 404.1504 provides that a decision by any non-governmental or governmental agency that an individual is disabled is based on its rules, and the Social Security Administration makes a determination of disability based on Social Security law. Accordingly, a determination by another agency that the claimant is disabled or unemployable is not binding on this Administration.

(Tr. 19, Filing 16-2 at 20).

The second paragraph above shows that the ALJ gave some consideration to the VA's disability determination and concluded it was entitled to little weight. The ALJ's stated reasons for reaching this conclusion are also legitimate. Although this discussion is extremely brief, it satisfies *Morrison*'s minimal requirement that the other agency's disability determination be addressed in the ALJ's decision. *See, e.g.*, *Hutchison v. Astrue*, No. 10-5090-CV-SW-ODS, 2011 WL 5838519, at *2 (W.D. Mo. Nov. 18, 2011) (sufficient discussion where ALJ wrote that she studied the VA's determination but did not give it substantial weight because it was based on diagnoses alone, which was not the standard applicable to Social Security claims).

However, the ALJ's decision does not indicate that he gave any consideration to the underlying opinions of medical sources, such as Ms. Head's assessment of Plaintiff's physical limitations.[8] Social Security Ruling 06-03p specifies that an

---

[7] Exhibit 10D is a VA Disability Rating Verification dated March 7, 2018, which has as an attachment a January 4, 2013 Rating Decision concerning Plaintiff's service connected physical and mental conditions. (See Tr. 240-57, Filing 16-6). The same or similar information is contained in Exhibits 1D, 2D, and 3D. (See Tr. 202-26, Filing 16-5 at 2-26).

[8] Ms. Head's "C&P Medical Opinion" is marked as Exhibit 10F. (See Tr. 3268-77, Filing 22-2 at 126-35). Plaintiff's attorney specifically referenced this

adjudicator must "evaluate the opinion evidence from medical sources … who have had contact with the [claimant] in their professional capacity, used by other agencies, that are in [the Social Security Administration's] case record, in accordance with 20 CFR 404.1527, 416.927, Social Security Rulings 96-2p and 96-5p, and the applicable factors listed above in the section 'Factors for Weighing Opinion Evidence.'" SSR 06-03p, 2006 WL 2329939, at *7  (S.S.A. Aug. 9, 2006).

Section 404.1527 provides rules for evaluating opinion evidence for disability claims filed before March 27, 2017. Ms. Head's opinions should be evaluated as provided in subjection (f), which states in part:

> (1) Consideration. Opinions from medical sources who are not acceptable medical sources[9] … may reflect the source's judgment about some of the same issues addressed in medical opinions from acceptable medical sources. Although we will consider these opinions using the same factors as listed in paragraph (c)(1) through (c)(6) in this section, not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source … depends on the particular facts in each case….

> (2) Articulation. The adjudicator generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case….

20 C.F.R. § 404.1527(f).

Ms. Head's opinions that Plaintiff "would be unable to perform labor type work" because of her pain, and that any type of sedentary work would be "difficult" and "very limited" because of the effects of Plaintiff's narcotic pain medication and her need to use the restroom every hour, are opinions on issues that are reserved to

---

exhibit in his opening remarks and emphasized its relevancy to Plaintiff's claim. (See Tr. 42, Filing 16-2 at 43).

[9] Physician assistants are not acceptable medical sources for claims filed prior to March 27, 2017. *See* 20 C.F.R. § 416.902(a)(8).

the Commissioner. *See* 20 C.F.R. § 404.1527(d). "The judgment regarding the extent to which an individual is able to perform exertional ranges of work goes beyond medical judgment regarding what an individual can still do and is a finding that may be dispositive of the issue of disability." SSR 96-5p, 1996 WL 374183, at *5 (S.S.A. July 2, 1996); *see also Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) ("Whether a claimant can work sedentary work is a question for a vocational expert, not a medical source."); *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010) (opinions that a claimant is "disabled" or "unable to work" concern issues reserved to the Commissioner).

"However, opinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." SSR 96-5p, 1996 WL 374183, at *3 (S.S.A. July 2, 1996). The ALJ's failure to do so in this case is reversible error.

### B. Dr. Severson's Opinions

An ALJ is required to evaluate every medical opinion in evidence. *Acacia C. v. Saul*, No. 8:20-CV-96, 2021 WL 1516451, at *19 (D. Neb. Apr. 16, 2021); *see* 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").

Exhibit 12F is a report that was prepared by Meryl Severson, M.D., regarding his consultative examination of Plaintiff on May 16, 2013, in connection with prior disability application. (See Tr. 3289-3300, Filing 22-2 at 147-58). The report's summary states that Plaintiff was unable to do any daily activities without pain, her ability to walk a distance was variable, she had pain on stairs, she could not stand for more than 10 minutes, and she had to lie down when her pain was severe. (See Tr. 3294, Filing 22-2 at 152).

The Commissioner acknowledges that "[t]he ALJ did not cite to Dr. Severson or his evaluation of Plaintiff disability application," but contends it was sufficient that "Jerry Reed, M.D., state agency physician, assessed Plaintiff's medical record, including Dr. Severson's medical report," and that the ALJ gave "significant weight to Dr. Reed's opinions that were based in part on his reading of Dr. Severson's examination record." (Filing 33 at 22-23). The administrative record does not show this to be the case, however.

While Dr. Severson's report is listed among the "evidence of record" that had been received by the agency at the initial level of deciding Plaintiff's claim, it was not identified as containing a medical opinion, and it was not cited or discussed in the "findings of fact and analysis of evidence." (See Tr. 90-97, Filing 16-3 at 3-10). There is a notation, "Clmt was previously denied in 2013. Please see past DDEs," (Tr. 96, Filing 16-3 at 9), but those 2013 "Disability Determination Explanations" are not in the administrative record. Nor was the report cited or discussed in the "findings of fact and analysis of evidence" at the reconsideration level. (See Tr. 110-15, Filing 16-3 at 23-28). Dr. Severson's statements may have been based primarily on the subjective reports of Plaintiff, who "was deemed a reliable historian" (Tr. 3269-70, Filing 22-2 at 147-48), but "[t]he interpretation of physicians' findings is a factual matter left to the ALJ's authority," and it is the ALJ's function—not the court's—to "weigh all the evidence in the record." *Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016). ALJ's failure to consider the report is reversible error.

### C. Plaintiff's Credibility

The credibility of a claimant's subjective complaints and other symptoms "is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). *See also Johnson v. Chater*, 87 F.3d 1015, 1018 (8th Cir. 1996) ("[W]e will not substitute our opinions for that of the ALJ, who is in a better position to assess a claimant's credibility."). Courts "do not reweigh the evidence presented to the ALJ," and must "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (internal quotation and citation omitted).

The ALJ is required to consider all of claimant's "symptoms, including pain, and the extent to which [those] symptoms can reasonably be accepted as consistent

with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a).
The ALJ must evaluate all of the claimant's statements about her "symptoms, such
as pain, and any description [the claimant's] medical sources or nonmedical sources
may provide about how the symptoms affect [her] activities of daily living and [her]
ability to work." *Id.*

Social Security Ruling 16-3p describes the process by which an ALJ should
"evaluate the intensity, persistence, and limiting effects of an individual's symptoms
in disability claims." SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017). To better
align SSA policy with the regulatory language and "clarify that subjective symptom
evaluation [under the applicable regulations] is not an examination of an individual's
character," SSR 16-3p eliminated use of the term "credibility" and the requirement
of a formal "credibility" finding. *Id.* While the SSA's focus has shifted away from
the claimant's "credibility," the underlying analysis is largely the same and remains
consistent with *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), which "sets
forth requirements for ALJs within the Eighth Circuit." *Randolph v. Barnhart*, 386
F.3d 835, 841 (8th Cir. 2004).

When assessing the credibility of a claimant's subjective allegations, "the ALJ
must consider the claimant's prior work history; daily activities; duration, frequency,
and intensity of pain; dosage, effectiveness, and side effects of medication;
precipitating and aggravating factors; and functional restrictions." *Tate v. Apfel*, 167
F.3d 1191, 1197 (8th Cir. 1999) (quoting *Baker v. Apfel,* 159 F.3d 1140, 1144 (8th
Cir. 1998) and applying analysis mandated by *Polaski*). "An ALJ may discount a
claimant's subjective complaints only if there are inconsistencies in the record as a
whole." *Jackson v. Apfel*, 162 F.3d 533, 538 (8th Cir. 1998) (quoting *Porch v.
Chater*, 115 F.3d 567, 572 (8th Cir. 1997)).

The ALJ in this case considered each of these factors and concluded that while
Plaintiff's "medically determinable impairments could reasonably be expected to
cause the alleged symptoms," her "statements concerning the intensity, persistence
and limiting effects of these symptoms are not entirely consistent with the medical
evidence and other evidence in the record …." (Tr. 17, Filing 16-2 at 18). The ALJ
then discussed these inconsistencies at some length.

Plaintiff complains the ALJ mischaracterized her testimony by stating that she
"testified that use of her neuro-stimulator essentially renders her bedridden and

causes imbalance, which results in frequent falls." (Tr. 18, Filing 16-2 at 19). She asserts:

> [Plaintiff] explained in her report to social security, inter alia, that when she needed to use her spinal cord stimulator for pain control, she needed to lie down. (Tr. 291, Filing 16-7 at 35) ("In addition, if my neurostimulator is on high, I can hardly move at all and remain in bed."). She explained that activities like sitting, standing and walking, and other light daily activities, exacerbated her pain, which would cause her to need to use her neurostimulator more. (See Tr. 292, Filing 16-7 at 36). She explained this again at her hearing. (See Tr. 50, Filing 16-2 at 51). She explained how often she used the spinal cord stimulator varied, depending on her pain, and explained if her pain was bad enough, she turned it on and "that's what I'm doing for that day, laying down. And waiting out the pain." (Tr. 54, Filing 16-2 at 55). She explained that she could use it up to five hours a day, and at best, she may just have it on in the evening. (See Tr. 54-55, Filing 16-2 at 55-56). [Plaintiff] was not claiming to be bedridden due to her need to use her spinal cord stimulator at times.

(Filing 33 at 23-24 (record citations edited for conformity)).

While the word "bedridden" has a negative connotation and suggests that a person is confined to bed for a prolonged period of time, the ALJ elsewhere in his decision provided a summary of Plaintiff's testimony that matches her description quite closely. The ALJ stated:

> At her hearing, the claimant testified that she had a neuro-stimulator implanted in her back in 2011 or 2012. She stated that when she turns this on she has to lie down because it vibrates and causes difficulty moving around or sitting. She stated that she usually turns it on daily, depending on the level of pain she experiences. She stated that when her pain is the worst, she will turn it on and lie down for 5 hours. She testified that it is usually worse at night and on good days, she might only turn on the neuro-stimulator in the evening. She stated that her neuro-stimulator affects her balance, and she falls often.

(Tr. 17, Filing 16-2 at 18). Furthermore, it was the alleged balance difficulties that the ALJ found to be inconsistent with the medical record, not whether Plaintiff was "bedridden." He stated:

Similarly, the claimant testified that use of her neuro-stimulator essentially renders her bedridden and causes imbalance, which results in frequent falls. The record medical evidence shows an instance in a February 2018 physical therapy note in which the claimant reported decreased balance, multiple falls of about 2 per month, and dizziness when the neuro-stimulator is on (Exhibit 8F). Aside from this subjective report, the record medical evidence lacks support for this allegation. While there are falls noted in the record, they are few in number and appear unrelated to the claimant's alleged balance difficulties and neuro-stimulator. For instance, July 2017 treatment notes show that the claimant sought treatment after a fall that was reportedly the result of slipping in the mud (Exhibit 8F). Another fall in early 2019 was reportedly the result of slipping on ice while using a snowblower (Exhibit 16F). Shortly after this, the claimant reportedly fell down two steps in her garage, but there is nothing to indicate that this, and the foregoing falls, was anything other than an ordinary accident, nor is there anything to indicate that the claimant's neuro-stimulator contributed to it in any way (Exhibit 7F).

(Tr. 18, Filing 16-2 at 19).

However, the fact that the ALJ did not discredit Plaintiff's testimony about needing to lie down when she uses the neurostimulator, or about how often and how long she needs to use it, is troubling. At the hearing, Plaintiff testified that during her last year in the Air Force she was only working half-days answering phones because her commander knew she "wasn't even going to make a full day." (Tr. 49, Filing 16-2 at 50). The ALJ asked why Plaintiff couldn't make a full day of "something pretty easy like that," and she replied:

The sitting, if I had the neurostimulator on, it basically—if I have it on a, like, a medium to high setting, you pretty much have to lay down. It's, like, it's vibrating inside of you because what it does is it tries to block that message to the brain that you have pain. So, it's vibrating, and so you're vibrating. And if that's on, like it's even at a medium setting, you pretty much have to lay down.

(Tr. 50, Filing 16-2 at 51). Plaintiff's attorney asked several follow-up questions, which culminated with Plaintiff stating that on average, she used the neurostimulator three or four hours each day, and that her current usage was about the same as it had been when she was last working. (Tr. 52-55, Filing 16-2 at 53-56). Plaintiff's

22

attorney also asked the VE to assume a hypothetical individual "needed to take rest periods of a couple hours a day to turn on their neurostimulator and lie down and they would be away from the workstation during this time period," and asked the VE whether that would be allowed in competitive employment. (Tr. 81-92, Filing 16-2 at 82-83). The VE responded, "Not in competitive employment, If it were allowed, it would be an accommodation." (Tr. 82, Filing 16-2 at 83). The ALJ's failure to address this aspect of Plaintiff's testimony is reversible error.

### D. ALJ's Duty to Develop the Record

Plaintiff argues that "[t]he ALJ erred by not further developing the record by either obtaining medical expert testimony or some further medical opinion based on a full record just what Plaintiff's physical limitations were, *if the ALJ was going to reject the available opinions of Ms. Head and Dr. Severson*, to fully develop the record concerning supporting medical opinion evidence concerning Plaintiff's limitations." (Filing 31 at 27) (emphasis supplied). This, however, "is an alternative argument to [Plaintiff's] prior arguments about these examining opinions," *i.e.*, that "[t]he ALJ did not evaluate these opinions and, judging by the ALJ's evaluation of the VA's individual unemployability rating, did not consider them at all when crafting Plaintiff's RFC." (Filing 31 at 27 n. 8).

Because Plaintiff has conceded that Ms. Head did not conduct a physical examination, and because the court has agreed with Plaintiff that the record does not show that Dr. Severson's opinions as an examining consultant were even considered by the ALJ, no discussion of this alleged error is necessary. On remand, however, the ALJ may wish to obtain clarification from Dr. Severson regarding his report. Development of the record may be needed "when the report from [a] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Grindley v. Kijakazi*, 9 F.4th 622, 630 (8th Cir. 2021) (quoting *Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010)).

### E. Step-5 Error

"When a VE … provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE … evidence and information provided in the

[Dictionary of Occupational Titles ("DOT")]. SSR 00-4p, 2000 WL 1898704, at *4 (S.S.A. Dec. 4, 2000). "When vocational evidence provided by a VE … is not consistent with information in the DOT, the [ALJ] must resolve this conflict before relying on the VE … evidence to support a determination or decision that the individual is or is not disabled." *Id.* It has long been the rule in this circuit that "before an ALJ can rely on a vocational expert's testimony that appears to conflict with a Dictionary listing, the ALJ must identify and resolve the conflict. Otherwise, the vocational expert's testimony is not substantial evidence to support a denial of benefits." *Stanton v. Comm'r, Soc. Sec. Admin.*, 899 F.3d 555, 558 (8th Cir. 2018)

In this case, the ALJ relied on VE testimony to find that Plaintiff was not disabled because she retained the RFC to perform other work available in the national economy. In his hypothetical questions to the VE, the ALJ asked if the hypothetical individual with a light RFC could perform Plaintiff's past relevant work as an exercise physiologist The VE explained the job of exercise physiologist was performed at the medium level, and the hypothetical individual with a light RFC could not perform Plaintiff's past relevant work. (Tr. 82, Filing 16-2).

The ALJ then asked, aside from Plaintiff's past relevant work, was there an occupational base the hypothetical individual could perform. The VE explained that with the stated limitations the hypothetical person could work at light unskilled jobs, and provided three examples:

- Mail Clerk, DOT 209.687-026 (Tr. 82) (1991 WL 671813, Light, SVP: 2, reasoning level 3).
- Photocopy Machine Operator, DOT 207.685-014 (Tr. 83) (1991 WL 671745, Light, SVP: 2, reasoning level 2).
- Office Helper, DICOT 239.567-010 (Tr. 83) (1991 WL 672232, Light, SVP: 2, reasoning level 2).

(Tr. 82, Filing 16-2).

The differences in reasoning levels between Mail Clerk and the other two jobs was not noted or discussed by the ALJ, VE, or Plaintiff at the administrative hearing. The ALJ also failed to discuss the difference in reasoning levels in the administrative decision. (Tr. 21, Filing 16-2). Thus, as argued by Plaintiff, there is an "apparent

24

conflict" between the reasoning levels of the jobs proffered by the vocational expert, and the ALJ did not obtain a reasonable explanation for the conflict before relying on the vocational expert's opinions.

In his RFC determination, the ALJ found "[Plaintiff] was able to perform work that was simple and uncomplicated and respond appropriately to at least routine changes in the workplace." (Tr. 16, Filing 16-2). The Eighth Circuit has found that an individual with similar limitations can perform jobs that require level 2 reasoning, but not level 3 reasoning. *See Stanton v. Commissioner*, 899 F.3d 555, 559 (8th Cir. 2018). Thus, the Commissioner acknowledges the ALJ improperly relied on the VE's testimony when in finding that Plaintiff could perform work as a Mail Clerk, which required a reasoning level of 3. (Filing 33 at 18-19).

Where the Commissioner concedes a point of error, the court will examine the case further to determine if substantial evidence still supports his administrative decision. *See Thomas v. Berryhill*, 881 F.3d 672, 677 (8th Cir. 2018) ("The Commissioner has conceded, however, that the expert erred in suggesting that machine tending was suitable work, so our review will focus only on whether the ALJ properly relied on the expert's testimony that someone with Thomas's RFC could handle the job requirements of a new accounts clerk").

The Commissioner asserts the ALJ properly relied on the vocational expert opinions with regard to the two remaining jobs that require a reasoning level of 2, which match the limitations in the ALJ's RFC determination. The regulations require the ALJ to rely on jobs that exist in significant numbers in the national economy that Plaintiff can perform. 20 C.F.R. § 404.1566(a) ("We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country"). The VE testified that in the national economy there were 19,000 Photocopy Machine Operator jobs, and 23,000 Office Helper jobs. (Tr. 21, Filing 16-2).

The Commissioner argues this constitutes a "significant number" of jobs and cites *Johnson v. Chater*, 108 F.3d 178 (8th Cir. 1997), in support of this claim. In *Johnson*, though, "[t]he vocational expert testified that a person like Johnson could perform sedentary, unskilled labor" like that of an addresser or document preparer, "and that there existed 200 jobs of addresser or document preparer in Iowa and

10,000 in the national economy." *Id.* at 180. The Eighth Circuit held "the vocational expert's "testimony was sufficient to show that there exist a significant number of jobs in the economy that Johnson can perform." *Id.* In reaching this decision, the Court rejected Johnson's contention that 200 jobs in Iowa is not a significant number of jobs, holding that district court cases she cited "are all fact-intensive, and none stand for the proposition that 200 jobs in Iowa is not a significant number." *Id.*, n. 3. In the present case, the VE only gave job figures for the "national economy." (See Tr. 82-83, Filing 16-2 at 83-84).

The Social Security Act provides that "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A). "For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*; *see* 20 C.F.R. § 404.1566(a) ("We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country.").

The United States District Court for the District of South Dakota, relying in part on the Seventh Circuit's decision in *Barrett v. Barnhart*, 368 F.3d 691 (7th Cir. 2004), has repeatedly held that VE testimony solely concerning national job numbers for DOT occupations is insufficient to carry the Commissioner's burden at step five of the sequential analysis; there must be direct evidence of a significant number of jobs either in the claimant's "region" or in "several regions." *See Benthin v. Saul*, No. 1:20-CV-01014-CBK, 2021 WL 2982719, at *7-8 (D.S.D. July 15, 2021) (VE's testimony regarding the number of jobs (not stated in the opinion) that exist "in the national economy" for housekeepers, laundry folders, and merchandise markers was insufficient evidence); *Paula G.S. v. Saul*, No. 4:20-CV-04041-VLD, 2021 WL 1599229, at *36-41 (D.S.D. Apr. 23, 2021) (VE's testimony that there were 680,000 total jobs "in the national economy" for bench assemblers, electronics workers, and

26

molding machine tenders was insufficient); *John B. H. v. Saul*, No. 4:20-CV-04080-VLD, 2021 WL 1192930, at \*35-37 (D.S.D. Mar. 30, 2021) (143,000 jobs available "nationally" for electronics workers, circuit board assemblers, and wafer cleaners was insufficient evidence); *Springer v. Saul*, No. 4:19-CV-04030-VLD, 2019 WL 4855186, at \*33-39 (D.S.D. Oct. 1, 2019) (VE's testimony that there were 49,000 copy machine operator and 68,000 clerical checker jobs available "nationally" was insufficient); *Larson v. Saul*, No. 4:18-CV-04121-VLD, 2019 WL 3823929, at \*31-33 (D.S.D. Aug. 15, 2019) (VE's testimony that there were 64,000 garment sorter, 125,000 laundry worker, and 500,000 hotel housekeeper jobs available "nationally" was insufficient); *Pogany v. Berryhill*, No. 4:18-CV-04103-VLD, 2019 WL 2870135, at \*38-41 (D.S.D. July 3, 2019) (VE's testimony that there were 64,000 garment sorter, 175,000 laundry worker, and 250,000 hotel housekeeper jobs available "nationally" was insufficient); *Porter v. Berryhill*, No. 5:17-CV-05028-VLD, 2018 WL 2138661, at \*62–64 (D.S.D. May 9, 2018) (VE's testimony that there were 143,000 sewing machine operator jobs, 83,000 office helper jobs, and 215,000 food and beverage order clerk jobs available "nationally" was insufficient); *Seay v. Berryhill*, No. 5:16-CV-05096-VLD, 2018 WL 1513683, at \*51-53 (D.S.D. Mar. 27, 2018) (VE's testimony that there were 271,000 merchandise marker jobs and 52,000 router jobs "in the United States" was insufficient); *Webb v. Berryhill*, 294 F. Supp. 3d 824, 902-04 (D.S.D. 2018) (VE's testimony that there were 271,000 merchandise marker jobs and 136,000 housekeeping cleaner jobs available "in the United States" was insufficient).

By contrast, the United States District for the Eastern District of Missouri, relying in part on the Ninth Circuit's decision in *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 528-29 (9th Cir. 2014), has taken a more pragmatic approach and held that "evidence of jobs existing nationally *does* constitute evidence of work existing in several regions of the country, at least where there is nothing in the number of jobs or the nature of the jobs identified to indicate that those jobs would exist only in limited numbers in isolated regions of the country." *Hayden v. Saul*, No. 4:19-CV-187-SPM, 2020 WL 888002, at \*10-12 (E.D. Mo. Feb. 24, 2020) (emphasis supplied) (finding a total of 200,000 jobs nationally for work as a product inspector, assembler, or packer was a significant number); *see Timms v. Saul*, No. 4:18 CV 1653 DDN, 2020 WL 247970, at \*5-6 (E.D. Mo. Jan. 16, 2020) (62,000 positions available in total nationwide for document preparers, envelope addressers, and

ampoule sealers was significant); *Hill v. Saul*, No. 4:18 CV 1329 DDN, 2019 WL 3947774, at *5-6 (E.D. Mo. Aug. 21, 2019) (300,000 positions available in total nationwide for housekeeper/cleaners, markers, and ticketers was significant); *Hussey v. Berryhill*, No. 4:17-CV-2507-SPM, 2019 WL 1275047, at *7-9 (E.D. Mo. Mar. 20, 2019) (72,500 positions available in total nationwide for school bus monitors, counter clerks, and office clerks was significant). *Cf. Britton v. Berryhill*, No. 4:17 CV 1956 DDN, 2018 WL 4332062, at *5-6 (E.D. Mo. Sept. 11, 2018) (declining to address issue inasmuch as the case was being remanded on other issues, but directing the ALJ to develop the record concerning job numbers). The Ninth Circuit in *Gutierrez*, while noting it was a "close call," held the ALJ's finding that 25,000 national jobs constituted "work which exists in significant numbers ... in several regions of the country" satisfied 42 U.S.C. § 1382c(a)(3)(B) (applicable to SSI benefits, but comparable to 42 U.S.C. § 423(d)(2)(A)). 740 F.3d at 528-29.

The Eighth Circuit "ultimately leave[s] to the trial judge's common sense the application of the significant numbers requirement to a particular claimant's factual situation." *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997). In this case, the VE testified there were at least 42,000 jobs available "in the national economy" that an individual with Plaintiff's RFC could perform. Job openings for photocopying-machine operator and office helpers may be more prevalent in large metropolitan areas, but these exist in several regions across the United States. There is nothing in the DOT descriptions to indicate that these jobs would be found only in isolated parts of the country.[10] Nor is there anything in the record to indicate that the VE or ALJ

---

[10] *See* Dictionary of Occupational Titles (4th ed. Rev. 1991), available online at United States Department of Labor, Office of Administrative Law Judges, https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT.

207.685-014 PHOTOCOPYING-MACHINE OPERATOR (clerical)**:**

Tends duplicating machine to reproduce handwritten or typewritten matter: Places original copy on glass plate in machine. Places blank paper on loading tray. Sets control switch for number of copies. Presses button to start machine which transfers image of original copy onto blank paper by photographic and static electricity process. May clean and repair machine. May receive payment

did not understand the meaning of "in the national economy," as defined in 42 U.S.C. § 423(d)(2)(A)). While it would have been preferable for the ALJ to elicit testimony from the VE regarding regional numbers, the evidence obtained in this case was sufficient to satisfy the Commissioner's burden, and the court finds 42,000 is a significant number of jobs under the particular facts of this case.

The ALJ clearly erred by failing to identify and resolve the conflict between the DOT and the VE's testimony concerning the reasoning level required for the position of mail clerk, but "reversal of an ALJ's decision is not required if an error was harmless, meaning '[t]here is no indication that the ALJ would have decided differently' if the error had not occurred." *Grindley v. Kijakazi*, 9 F.4th 622, 629 (8th Cir. 2021) (quoting *Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008). An error is harmless when the claimant fails to "provide some indication that the ALJ would have decided differently if the error had not occurred." *Lucus v. Saul*, 960 F.3d 1066, 1069 (8th Cir. 2020) (quoting *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012). The evidence supports a finding that there were a significant number of photocopying-machine operator and office helper jobs available in the national economy, and the court has no reason to believe the ALJ would have found otherwise.

---

for duplicate copies. Important variables may be indicated by trade name of machine tended.

239.567-010 OFFICE HELPER (clerical)

Performs any combination of following duties in business office of commercial or industrial establishment: Furnishes workers with clerical supplies. Opens, sorts, and distributes incoming mail, and collects, seals, and stamps outgoing mail. Delivers oral or written messages. Collects and distributes paperwork, such as records or timecards, from one department to another. Marks, tabulates, and files articles and records. May use office equipment, such as envelope-sealing machine, letter opener, record shaver, stamping machine, and transcribing machine. May deliver items to other business establishments [DELIVERER, OUTSIDE (clerical) 230.663-010]. May specialize in delivering mail, messages, documents, and packages between departments of establishment and be designated Messenger, Office (clerical). May deliver stock certificates and bonds within and between stock brokerage offices and be designated Runner (financial).

### F. Separation of Powers

Finally, Plaintiff contends former Commissioner Saul's "unconstitutional removal protection, which clearly impeded President Biden in removing [him] prior to the Supreme Court's resolution of *Collins v. Yellen*, [141 S. Ct. 1761, 2021 WL 2557067 (June 23, 2021),] tainted the agency's resolution of [Plaintiff's] case." (Filing 31 at 28-29). One obvious fallacy with this argument is that President Biden did not take office until January 20, 2021—more than two months after the Appeals Council denied review of the ALJ's decision—and there is no evidence that Mr. Biden's predecessor ever sought to remove his own appointee from office. There is no causal connection between the allegedly unconstitutional removal protection and the ALJ's adverse decision.

In *Collins*, the Supreme Court held that where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction caused her alleged harm. The Court reasoned that the relevant agency officials were "properly appointed" pursuant to a statute that exhibited "no constitutional defect in the ... method of appointment" and that "the unlawfulness of [a] removal provision" does not strip [an official] of the power to undertake the other responsibilities of his office[.]" The Court continued that "there is no reason to regard any of the actions taken" by the agency during this period "as void." *Id.* at 1787, 1788 n. 23.

"In this case, Plaintiff, as in *Collins*, grounds [her] constitutional challenge only on the relevant removal restriction not on the propriety of the Commissioner's appointment and offers no evidence to show that there is a nexus between the unconstitutional removal restriction and the denial of his application for disability benefits. The Plaintiff simply argues that all actions taken by the Commissioner— and in turn his appointed ALJ's—are void due to the unconstitutional removal provision. However, *Collins* expressly rejects this view. Therefore, the final decision of the ALJ is not constitutionally defective." *Boger v. Kijakazi*, No. 1:20-CV-00331-KDB, 2021 WL 5023141, at *3 (W.D.N.C. Oct. 28, 2021) (citation omitted).

Also, the ALJ's decision in this case was issued on July 17, 2019, one month after Mr. Saul took office. The ALJ who decided Plaintiff's case was appointed by then-Acting Commissioner Berryhill, who could be removed from that office at the

President's discretion. *See* 42 U.S.C. § 902(b)(4); *Collins*, 141 S. Ct. at 1783 ("[W]e generally presume that the President holds the power to remove at will executive officers and that a statute must contain 'plain language to take [that power] away.'"); *Boger*, 2021 WL 5023141, at *3 n. 4 ("Plaintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because [the ALJ] was appointed by an *Acting* Commissioner of Social Security who could be removed from that office at the President's discretion." (emphasis in original)).

Thus, there is no need to consider several other arguments advanced by the Commissioner (i.e., harmless error, De Facto Officer doctrine, Rule of Necessity, and broad prudential considerations) in support of the constitutionality the ALJ's decision. Plaintiff's request that her case "be remanded for a de novo hearing before a new ALJ who does not suffer from the unconstitutional taint of having previously heard and decided this case when the ALJ had no lawful authority to do so" (Filing 31 at 30) is denied, but the case will be remanded for further proceedings.

## VI. CONCLUSION

The ALJ committed reversible error by (1) failing to evaluate the opinions of Christina J. Head, MS, PA-C, (2) failing to consider the report of Meryl Severson, M.D., and (3) failing to make a proper assessment of Plaintiff's testimony regarding her use of the neurostimulator. It is not necessary to consider Plaintiff's alternative argument that the ALJ failed in his duty to develop the record. The ALJ's reliance upon the VE's erroneous testimony was harmless error. Finally, because there is no merit to Plaintiff's constitutional argument, she is not entitled to a de novo hearing before a different ALJ.

Accordingly,

IT IS ORDERED:

1. Plaintiff's motion for an order reversing the Commissioner's decision (Filing 30) is granted.

2. Defendant's motion for an order affirming the Commissioner's decision (Filing 32) is denied.

3.  The decision of the Commissioner is reversed pursuant to sentence four of 42 U.S.C. § 405(g) and the case is remanded for further proceedings consistent with the foregoing opinion.

4.  Judgment will be entered by separate document.

Dated this 15th day of November 2021.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge